UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK
_____

ARLINE RAMOS,

                              Plaintiff                   DECISION AND ORDER

-vs-
                                                          13-CV-6542 CJS

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.
_____

APPEARANCES

For the Plaintiff:              Kenneth R. Hiller, Esq.
                                Ida M. Comerford, Esq.
                                Justin M. Goldstein, Esq.
                                Law Offices of Kenneth Hiller, PPLC
                                6000 North Bailey Avenue, Suite 1A
                                Amherst, New York 14226

For the Defendant:              Benil Abraham, Esq.
                                Elizabeth Rothstein, Esq.
                                Social Security Administration
                                Office of General Counsel
                                26 Federal Plaza, Room 3904
                                New York, New York 10278

                                Kathryn L. Smith, A.U.S.A.
                                Office of the United States Attorney
                                for the Western District of New York
                                100 State Street, Room 500
                                Rochester, New York 14614

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Arline Ramos ("Plaintiff") for Social Security Disability

1

benefits.  Now before the Court is Plaintiff's motion (Docket No. [#12]) for judgment on

the pleadings and Defendant's cross-motion [#15] for judgment on the pleadings.

Defendant's application is granted and Plaintiff's application is denied.

PROCEDURAL HISTORY

On May 14, 2011, Plaintiff applied for disability benefits, claiming to be disabled

due to "left leg problems," "surgery on left ankle," "reconstructed . . . ligaments,""nerve

entrapment and scar tissue removal," "tennis elbow and "mini stroke in 2010." (148).

Plaintiff later expanded her claim to include other ailments, as discussed below.

The Commissioner denied that application, and on May 21, 2012, an

Administrative Law Judge ("the ALJ") conducted a hearing at which Plaintiff appeared,

with her attorney, and testified. (27-71).  On June 14, 2012, the ALJ issued a Decision

(13-22)[1] finding that Plaintiff was not disabled at any time between January 1, 2009, the

date that she claims to have become disabled, and the date of the decision.  On August

15, 2013, the Appeals Council denied Plaintiff's request for review. (1).

On October 2, 2013, Plaintiff commenced this action.  Plaintiff maintains that the

Commissioner's ruling must be reversed for the following reasons: 1) the ALJ did not

properly evaluate her credibility because he failed, in the first instance, to indicate

whether she had a medically determinable impairment that could reasonably be

expected to produce her alleged pain; 2) the ALJ did not properly evaluate her

credibility because, in considering the factors under 20 CFR § 404.1529, he

"misconstrued [her] testimony on a number of important issues," such as the frequency

---

[1]Citations are to the Administrative Record unless otherwise indicated.

of her mental health therapy sessions and the extent of her activities of daily living; and

3) the ALJ failed to give good reasons for giving only limited weight to the opinion of her

treating rheumatologist.

## VOCATIONAL HISTORY

At the time of the hearing Plaintiff, who was 42 years of age, had earned her

GED degree and had worked at various jobs, including that of secretary for a moving

company, collater for a book-binding company, sales associate for a telemarketing firm,

and food service worker for different companies, including McDonald's. (180).

## ACTIVITIES OF DAILY LIVING

On March 7, 2011, Plaintiff, who lives with her husband, two school-age sons,

two adult daughters and one grandchild, completed a report detailing her activities of

daily living ("ADLs"). (171-179).  Plaintiff indicated that on a typical day she drives her

husband and daughter to work, gets her younger children ready for school, goes to

work herself,[2] runs errands for her in-laws, and helps her children with homework.

(172).  Plaintiff stated that she cooks meals for the family "3-4 times a week" with help

from her daughters and husband, and that the rest of the time she prepares microwave

meals. (173).  Plaintiff also reported that she performs household cleaning chores with

help from her daughters. (174).  With regard to the help that she receives from her

daughters, Plaintiff testified, for example, that she can do "a few loads" of laundry by

herself before needing help from daughters. (61).  Similarly, Plaintiff indicated that she

---

[2]Plaintiff was working part-time at McDonald's until two weeks prior to the administrative hearing in this action. (35).  Plaintiff testified that between November 2011 and May 2012, she worked four hours per week at McDonalds, and that during the year prior to November 2011 she worked "10 to 15 hours a week." (36).

does the family cooking, but that she asks her daughters for help with repetitive tasks such as "mixing rice" "constantly." (62).  Plaintiff stated that she goes shopping once or twice per month, and spends "maybe 1-2 h[ours]" shopping. (175).  Plaintiff further indicated that she spends time with her children, watches television, goes on the computer and listens to music. (175).  Plaintiff reported that she does not socialize much, but does have telephone conversations with family members, who live out-of-state, "once or twice a month." (176).

In the same report, when asked to describe changes in her lifestyle caused by her alleged impairments, Plaintiff stated, for example, that she no longer goes bowling or fishing, that she cannot lift heavy objects with her right hand, that she cannot "stand [walk or sit] for long periods," that she gets short of breath climbing stairs, that kneeling and squatting are painful, that her hands hurt when used repetitively, and that she cannot reach with her right arm. (176-177).  On April 22, 2011, Plaintiff completed a similar report concerning her ADLs. (189-196).

At the administrative hearing, Plaintiff stated that she can stand for about 30 minutes before needing to change position, due to pain in her back. (46).  Plaintiff stated that she can sit for about 45 minutes at a time before her legs start to go numb. (47).  Plaintiff indicated that she can walk "probably a block, a block and a half," before her knees start to hurt. (47).

MEDICAL EVIDENCE

Plaintiff's medical history was summarized in the parties' submissions and need not be repeated here in its entirety.  It is sufficient to note the following facts.

In 2006, podiatrist Michael Giordano, D.P.M. ("Giordano") performed surgery on

4

Plaintiff's left ankle, based on a diagnosis of "ankle instability." (216).  In 2007,

Giordano again performed surgery on the same foot, to relieve a "nerve entrapment"

that was apparently caused by scar tissue from the earlier surgery (257-258).  Plaintiff

indicated that such condition caused her to experience pain and stiffness in the foot.

(265).  On February 2, 2007, an MRI of Plaintiff's ankle showed, *inter alia*, "stable mild

achilles tendonopathy," "stable mild chronic plantar fasciitis," and "mild degenerative

changes." (822).

On September 5, 2007, rheumatologist Ana Arango, M.D. ("Arango") examined

Plaintiff, who was complaining of swelling, pain and numbness in her hands. (874-875).

Arango performed physical and neurological examinations, the results of which were

normal. (875).  Arango's impression was that Plaintiff might have carpal tunnel

syndrome and/or Raynaud's disease, and she indicated that she would request further

testing. (875).  On September 19, 2007, Arango indicated that she had obtained testing

for possible conditions, such as rheumatoid arthritis, that might explain Plaintiff's

symptoms, but that the results were negative. (876).

On October 4, 2007, Arango informed Plaintiff's primary care physician that

Plaintiff most likely had "ulnar/median nerve compression." (878).  Arango added that

Plaintiff was making additional complaints of pain in her hips and back, and that there

was evidence of tenderness in Plaintiff's hips. (878).

On February 4, 2008, Arango reported that Plaintiff was still complaining of pain

in her hands.  Arango opined that, "Patient has a seronegative arthropathy." (881).

Arango indicated that she would have Plaintiff take a non-steroidal anti-inflammatory

drug, Arthrotec, to see if she had any improvement, and if not, have Plaintiff try

Prednisone. (881).

On June 1, 2008, Arango noted that Plaintiff's hand pain was better, but that she was still having some swelling and pain, and stiffness in the morning. (883). Arango stated that Plaintiff's hand/wrist symptoms were "consistent with DeQuervain's tenosynovitis." (883).

On March 24, 2010, Plaintiff's primary care physician, Beatrice Deshommes, M.D. ("Deshommes") reported that Plaintiff was continuing to complain of numbness and tingling in her extremities, dizziness and migraines, but that the "etiology for [her] symptoms [was] unclear." (383). For the headaches, Deshommes prescribed Amitryptyline, for Plaintiff to take at bedtime. (713). Deshommes indicated that Plaintiff could continue to work, despite her symptoms. (383).

On April 19, 2010, Plaintiff told Deshommes that she was having increased foot pain after standing for more than two hours at a time. (702). Plaintiff further stated that, during the previous two months, she had been having pain in her left knee and hip after climbing stairs and standing. (702). Plaintiff also stated that she was having numbness in her left leg after sitting for 30-45 minutes. (702). Plaintiff indicated that she was treating the pain with ibuprofen. (702).

On July 12, 2010, Arango reported that Plaintiff was complaining of "generalized pain, especially involving shoulders, knees, ankles, elbows." (450). Arango stated that Plaintiff had a "mildly elevated sedimentation rate" (referring to a blood test that monitors inflammation in the body), but "negative rheumatoid factor," negative "CCP" and negative ANA" (referring to a tests for autoimmune diseases such as rheumatoid arthritis). (450). Arango indicated that she would do further testing.

6

On July 15, 2010, neurologist Jebin Chacko, M.D. ("Chacko") examined Plaintiff, after she complained of "stroke-like" symptoms, consisting of dizziness and numbness and tingling in her arm. (478-480).  Chacko reported that Plaintiff claimed to have had several such incidents, but that testing performed almost immediately thereafter found no evidence of a cause or of any actual stroke.  Chacko observed that Plaintiff also "has a history of relatively infrequent migraine headaches." (478).  Chacko conducted a neurological examination, the results of which were normal. (479).  Chacko also ordered an EEG examination, the results of which were also normal. (348).  Chacko indicated that he could find no explanation for Plaintiff's symptoms. (348).

On September 14, 2010, Arango saw Plaintiff again, at which time it appears that her diagnosis was "ulnar tunnel syndrome," for which she prescribed "wrist splints." (453).

On February 1, 2011, Ralph Pennino, M.D. ("Pennino") reported that Plaintiff was complaining of increased pain in her right elbow, which Pennino attributed to "recalcitrant right lateral epicondylitis" (tennis elbow). (446).  Plaintiff stated that she experienced pain extending from the elbow down her forearm, which was aggravated by activities such as washing dishes and doing her hair. (446).  Plaintiff further indicated that the pain caused her to reduce her work hours at McDonald's from ten hours to five hours. (448).  Pennino examined Plaintiff and reported that her elbow was tender. (446).

On March 8, 2011, David Carrier, M.D. ("Carrier") performed "epicondyle release and repair" surgery on Plaintiff's right elbow. (316).  On March 16, 2011, Carrier reported that Plaintiff was doing "reasonably well" following the surgery. (488).  On April

13, 2011, Carrier added that Plaintiff was "doing fine" and should start physical therapy. (489).

On June 2, 2011, Arango's nurse practitioner, Karen McMurtry, RN, FNP ("McMurtry"), reported that Plaintiff was complaining of "worsening generalized pain." (454).  McMurtry conducted a physical examination that was generally normal, except for findings of tenderness, upon palpation of the neck and shoulders, as well as "diffuse" tenderness of the hands and wrists. (455).  McMurtry reported that she would order new autoimmune testing, referring to the fact that the prior autoimmune testing had been essentially negative. (455).

On June 16, 2011, neurologist Chacko saw Plaintiff again, after having examined her a year earlier. (481).  Chacko noted that the tests that he had performed a year earlier had all been negative, but that Plaintiff was now complaining of more constant symptoms that involved her right arm. (481).  Specifically, Plaintiff indicated that she had constant pain in her neck that radiated into her right arm. (481).  Chacko again performed a neurologic examination, the results of which were normal. (481).  Chacko obtained nerve conduction studies to rule out "median neuropathy at the wrists and cervical radiculopathy" (481), and the test results were normal. (482) ("There is no electrodiagnostic evidence for bilateral median neuropathies or a left cervical radiculopathy . . . .  There is also no electrodiagnostic evidence for a right ulnar neuropathy.").

On July 11, 2011, Deshommes met with Plaintiff to discuss test results. (724-725).  At that time Plaintiff was complaining of "left-sided numbness," back pain, and a pinching sensation in her left foot. (724).  Plaintiff stated that she had stopped working

8

in February, 2011. (724).  Plaintiff also complained of left-sided chest pain, but Deshommes opined that such pain was due to Plaintiff's anxiety and/or gallbladder problems. (724).  Deshommes reported that Plaintiff's "neurologic exam is has [sic] always been essentially normal." (724).  Deshommes examined Plaintiff's back and left foot and found nothing unusual. (725) ("Left foot ankle exam essentially normal there is no swelling or redness there is no tenderness . . . back exam revealed no spinal tenderness no paraspinal tenderness normal range of motion[.]").  Deshommes' impression included depression and "chronic complaint of left-sided numbness with normal exam again [sic] now question of [sic] this is somatic in nature." (725). Deshommes indicated that further diagnostic testing was not warranted, and she encouraged Plaintiff to pursue "continued psychiatric therapy." (725).

On July 15, 2011, Carrier reported that Plaintiff's arm felt better than before the surgery, but that she was still having "occasional discomfort" when gripping objects. (492).  Carrier opined that Plaintiff "should be able to return to some type of work." (492).

On August 16, 2011, Deshommes met with Plaintiff, at which time she reiterated that Plaintiff's neurologic testing was "normal." (621).   Plaintiff indicated that she continued to feel depressed, but was not attending sessions with her counselor because of "multiple issues at home," involving family members.[3] (621).  Deshommes encouraged Plaintiff to pursue counseling, and she further indicated that she would not obtain any further neurovascular testing to explain Plaintiff's symptoms, since she had a

---

[3]For example, Plaintiff indicated that one of her daughters was pregnant. (621).

"strong suspicion" that Plaintiff's physical complaints were related to her "ongoing depression and anxiety." (621).

On November 21, 2011, Deshommes reported that Plaintiff had returned to work, 15 hours per week, which required her to stand for the entirety of three five-hour shifts. (625).  Plaintiff indicated that such work caused her to feel pain in her left foot, knees, hands and elbow, which she treated with ibuprofen. (625).  Despite Deshommes' earlier recommendation that Plaintiff pursue mental health therapy, Plaintiff indicated that she had stopped attending counseling because she did not feel that the therapist was interested in her problems. (625).  Deshommes encouraged Plaintiff to find another therapist. (625).  Regarding Plaintiff's pain, Deshommes encouraged her to follow up with a neurologist, even though prior neurologic testing had been negative. (625). Deshommes further encouraged Plaintiff to obtain better footwear, and to take a break after standing for 2.5 hours. (625).

On February 29, 2012, Arango reported that although Plaintiff was still complaining of pain and stiffness, her physical examination was normal, and she had "full range of movement, no active synovitis," but had tenderness to palpation in her arms, hips and back. (889).  Arango's impression was that Plaintiff had "medial and lateral epicondylitis, ulnar tunnel syndrom," and that she might need to "follow up with the orthopedic surgeon." (890).

On April 4, 2012, Arango reported that Plaintiff was complaining of "severe pain in both hands after scrubbing 2 days ago." (891).  Plaintiff was also complaining of "mid thoracic pain, especially at night." (891).  Based upon Plaintiff's collection of symptoms and complaints, Arango stated, "I suspect an inflammatory connective tissue disease

[is] driving her symptoms." (892).  Arango prescribed Plaquenil and a "tapering dose" of Prednisone. (892).

On May 3, 2012, Arango's NP, McMurtry, provided a detailed narrative report, apparently in connection with Plaintiff's application for disability benefits. (895-897). The report details Plaintiff's subjective complaints of pain, as already discussed above. (895).  The report also lists Plaintiff's self-reported limitations on her exertional abilities. For example, Plaintiff indicated that she could sit, while driving, for "30-60 minutes without difficulty," that she could "lift 20 pounds on an intermittent basis," and that she could reach overhead intermittently." (895).  Plaintiff further stated that she developed pain in her hands from doing "gripping" or "fine work with her hands," after 10-15 minutes. (895).  Plaintiff also stated that she could stand for ten to fifteen minutes at a time and, significantly, she estimated that she could stand "for 4 hours [i]n an 8 hour time period given the opportunity to change positions at will." (896).  Additionally, Plaintiff indicated that she could "walk for 2-3 hours [i]n an 8 hour time period given the opportunity to change positions at will," and that she could "sit for 4 hours [i]n an 8 hour time period given the opportunity to change positions." (896).  Plaintiff further indicated that she could climb stairs, twist, stoop and bend intermittently, but not continuously. (896).  Plaintiff stated, though, that she thought that she would "likely be absent from work more than 4 days per month due to worsening pain." (896).  McMurtry indicated that Plaintiff's physical examination was essentially normal, except that Plaintiff had tenderness in her elbows, hands, wrists, ankles, knees and toes. (896).

Also on May 3, 2012, Arango completed a form entitled "Arthritis Residual Functional Capacity Questionnaire," also apparently in connection with Plaintiff's pursuit

11

of disability benefits. (899-903).  Arango indicated that her diagnosis was "inflammatory

arthritis," although none of her office notes actually refer to such a diagnosis *per se*.

(899).  Further to that point, Plaintiff's testimony during the administrative hearing

suggests that Arango never specifically told her that she had "inflammatory arthritis."

*See, e.g.* (46) ("Q. What causes that, what causes your hand to feel that way?  A. I

have no idea but Dr. [A]rango told me it *could be* from arthritis.") (emphasis added); *see*

*also*, (49) ("She's [Arango] saying that this *could* all be related to a certain arthritis.")

(emphasis added).  Similarly, Plaintiff's counsel in this action seems hesitant to rely

strictly on Arango's purported diagnosis of "inflammatory arthritis," by instead referring

to Plaintiff's condition as her "inflammatory arthritis/connective tissue disorder." Pl.

Memo of Law [#12-1] at p. 20.  In short, it seems that the only time that Arango ever

purported to make a definitive diagnosis of Plaintiff's condition was when she provided

the aforementioned report.  For years prior to that, as documented above, it appears

that Arango was unsure what was behind Plaintiff's complaints of pain, although she

suspected, at various times, that Plaintiff's complaints were caused by some

unspecified disease of the joints or connective tissue. *See, e.g.*, (875, 878, 881, 886,

888, 890, 892, 914).

When asked to describe the objective signs that supported her diagnosis of

inflammatory arthritis, Arango listed impaired sleep, tenderness, trigger points and

swelling. (899).  Arango also stated that, from what Plaintiff had told her (900),  Plaintiff

had depression and anxiety that would interfere with her attention and concentration,

but that Plaintiff was nevertheless capable of performing low-stress jobs. (900).   With

regard to exertional abilities, Arango stated that Plaintiff could walk for only "5-10 mins," could sit for only 20 minutes before needing to change position and could stand for only 10-15 minutes before needing to move.  Arango opined that during an 8-hour workday, Plaintiff could sit for about four hours and stand/walk for only about two hours, which, the Court notes, is significantly more restrictive, with regard to standing, than what Plaintiff herself indicated to McMurtry (4 hours), as set forth in McMurtry's report that was completed the same day as Arango's report. (901).  Arango further stated, based solely on Plaintiff's own estimate, that Plaintiff would likely miss work "more than four days per month" of work. (903).

On June 11, 2012, Plaintiff reportedly told Arango that she was feeling better, but was still having some problems such as pain in her hands and morning stiffness. (913). Arango listed Plaintiff's conditions as follows:

> [E]levated sedimentation rate, negative rheumatoid factor, negative CCP, low titer ANA, TIA, back pain with some inflammatory characteristics, plantar fasciitis, Achilles tendonitis, Low titer ANA [sic], negative specific antibodies, Raynaud's, mildly elevated inflammatory markers, responsive to prednisone, undifferentiated connective tissue disease.

(914).

As mentioned above, Arango's reports allude to depression and anxiety, although she never treated Plaintiff for those conditions.  Nevertheless, Plaintiff has a history of depression which, the record indicates, is largely related to marital disputes with her husband. (529, 531, 538, 589, 598, 601, 603, 605, 642-643, 646, 662-663, 724, 864-865).  Plaintiff threatened to harm herself on one occasion during an argument, but overall her symptoms are not severe. (*See, e.g.*, 589) ("The patient has

13

no apparent associated signs or symptoms.  Severity of symptoms: At their worst the symptoms were moderate.").  Furthermore, the record indicates that Plaintiff frequently failed to attend scheduled therapy sessions. (862).  For example, on January 3, 2012, Unity Health System discharged Plaintiff from mental health counseling, observing that "she has missed several scheduled therapy sessions," and that termination was necessary "due to loss of contact and her struggle to engage with treatment." (862-863).  In short, as Plaintiff's counsel admitted in her opening statement at the hearing, Plaintiff "hasn't followed up with mental health treatment." (33).  Plaintiff does not take any medication for depression.[4]

X-rays and other diagnostic tests performed in response to Plaintiff's complaints have been generally negative.  On April 20, 2010, x-rays of Plaintiff's left knee and left hip were  "normal." (340-341).  On May 20, 2010, a CT scan of Plaintiff's brain, taken after she complained of dizziness, was "negative" for any problem. (343).  On July 17, 2010, an electroencephalogram test was "normal." (348, 376).   On June 8, 2010, an x-ray of Plaintiff's cervical spine which showed "straightening of the normal cervical lordosis from C2-C6," "mild degenerative disc disease and disc space narrowing from C4-5 to C6-7" with "minimal facet degenerative changes," and "a small posterior disc osteophyte complex" at C6-C7, "without spinal canal or neural foraminal stenosis." (465).  The radiologist's impression was "mild degenerative disc disease." (465).  On January 1, 2012, an x-ray of Plaintiff's lumbar spine showed "mild rotary scoliosis and partial lumbarization of S1," with no significant change from an x-ray taken in 2007.

---

[4]When the ALJ asked Plaintiff is she took any such medicine, Plaintiff indicated that the only drug she takes is amitriptyline, which is prescribed to her for headaches. (56).

(801).  However, no medical provider of record has indicated that Plaintiff's pain

symptoms are caused by the mild degenerative changes in her spine.

The foregoing medical information was taken from the records of Plaintiff's

treating doctors.  Plaintiff was also examined by non-treating consultative doctors, at

the Commissioner's request, and the following information is taken from their notes.

On April 29, 2011, consultative psychologist Christine Jean-Jacques, Ph.D.

("Jean-Jacques") performed a psychiatric evaluation. (409-414).  Plaintiff reportedly told

Jean-Jacques that her "elbow surgery and ongoing ankle pain" were preventing her

from working full time. (409).  Plaintiff also told Jean-Jacques, though, that she

experienced pain in her back, arms, legs, hips and neck, as well as migraines. (*Id*.).

Plaintiff also indicated that she felt depressed, and experienced crying spells, feelings

of hopelessness, difficulty concentrating and excessive anxiety over everyday matters.

(409-410).  Plaintiff indicated that she had a poor relationship with her spouse. (412).

Plaintiff indicated that she was able to perform household chores with assistance from

her daughters, due to "difficulties with arm and shoulder pain." (412).

Following examination and testing, Jean-Jacques reported that Plaintiff's affect

and mood were depressed, but that her thought process was coherent and goal

directed without evidence of delusions or hallucinations, that she was oriented, that her

attention and concentration were intact, that her memory was intact and that her insight

and judgment were good. (411-412).  Jean-Jacques concluded that Plaintiff was

capable of understanding and following simple directions and instructions, performing

simple and complex tasks independently, maintaining concentration and attention,

maintaining a regular schedule, learning new tasks, making appropriate decisions,

15

dealing with stress and interacting with others. (412-413).  Jean-Jacques recommended that Plaintiff pursue psychological therapy, and opined that the prognosis was "good given [Plaintiff's] insight and judgment." (413).

On April 29, 2011, Sandra Boehlert, M.D. ("Boehlert") performed a consultative internal medicine examination. (416-420).  Plaintiff reportedly told Boehlert that her problems included pain in her back, right elbow, right knee, right hip, left ankle, both shoulders, and neck, migraine headaches twice per week, swelling in her hands and legs, dizziness, and intermittent chest pain. (416).  Plaintiff told Boehlert that her rheumatologist, Arango, told her that she had "inflammatory arthritis or inflammatory changes." (416).  Plaintiff told Boehlert that she had difficulty standing and walking for "long periods," but apparently did not mention any problem sitting. (417).

Boehlert performed an examination and reported that Plaintiff was morbidly obese, that she could not walk heel-to-toe due to pain in her left foot, and that she had difficulty squatting due to knee pain. (418).  Boehlert further reported that Plaintiff complained of some pain in her shoulders, knee and hip when doing range-of-movement testing.   However, Boehlert reported that the examination was otherwise essentially normal. (418-419).  Specifically, Boehlert found that Plaintiff had a full range of movement in her spine, shoulders, knees, ankles and hips, that straight-leg testing was negative, that neurologic testing was normal, and that Plaintiff had full strength in her extremities and full grip strength and dexterity in both hands. (419).  Boehlert's diagnosis was that Plaintiff had pain in her left foot/ankle and right elbow secondary to surgeries, as well as pain in her back, right hip and knees, which she seemed to summarize as being "chronic myalgias, unclear etiology." (419).  Boehlert's opinion

regarding Plaintiff's restrictions was, in pertinent part, as follows:

> The claimant has mild limitation to bending, twisting of the lumbar spine or heavy exertion.  Moderate limitation to heavy ambulation or repetitive exertion in the standing position.  Mild to moderate limitation to repetitive push, pull with the right arm, or overhead reaching repetitively with the right elbow.  Mild limitation to squatting, kneeling due to knee pain.

(419-420).  Boehlert did not identify any restriction with regard to sitting.

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of

17

those listed, the SSA will presume the claimant to be disabled.  If the impairment
is not so listed, then the SSA must determine whether the claimant possesses
the "residual functional capacity" to perform his or her past relevant work.
Finally, if the claimant is unable to perform his or her past relevant work, then the
burden shifts to the SSA to prove that the claimant is capable of performing "any
other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

Under the regulations, a treating physician's opinion is entitled to controlling

weight, provided that it is well-supported in the record:

If we find that a treating source's opinion on the issue(s) of the nature and
severity of your impairment(s) is well-supported by medically acceptable
clinical and laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in your case record, we will give it
controlling weight.

20 C.F.R. § 416.927(c)(2); 20 C.F.R. § 404.1527(c)(2).  However, "[w]hen other

substantial evidence in the record conflicts with the treating physician's opinion . . .  that

opinion will not be deemed controlling.  And the less consistent that opinion is with the

record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d

Cir. 1999)(*citing* 20 C.F.R. § 404.1527(c)(4), formerly designated as 20 C.F.R. §

404.1527(d)(4)).  Nevertheless,

[a]n ALJ who refuses to accord controlling weight to the medical opinion of
a treating physician must consider various 'factors' to determine how
much weight to give to the opinion. 20 C.F.R. § 404.1527[(c)](2). Among
those factors are: (i) the frequency of examination and the length, nature
and extent of the treatment relationship; (ii) the evidence in support of the
treating physician's opinion; (iii) the consistency of the opinion with the
record as a whole; (iv) whether the opinion is from a specialist; and (v)
other factors brought to the Social Security Administration's attention that
tend to support or contradict the opinion. *Id*. The regulations also specify
that the Commissioner 'will always give good reasons in [her] notice of
determination or decision for the weight [she] give[s] [claimant's] treating
source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927[(c)](2); *see also Schaal*,
134 F.3d at 503-504 (stating that the Commissioner must provide a

claimant with "good reasons" for the lack of weight attributed to a treating
physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  However, an ALJ is not required

to explicitly discuss each factor, as long as his "reasoning and adherence to the

regulation are clear." *Atwater v. Astrue*, 512 Fed. Appx. 67, 70, 2013 WL 628072 at *2

(2d Cir. Feb. 21, 2013) ("Atwater challenges the ALJ's failure to review explicitly each

factor provided in 20 C.F.R. § 404.1527(c). We require no such slavish recitation of

each and every factor where the ALJ's reasoning and adherence to the regulation are

clear.") (citation omitted).

Administrative Law Judges are required to evaluate a claimant's credibility

concerning pain according to the factors set forth in the Commissioner's regulations,

which state, in relevant part:

> In determining whether you are disabled, we consider all your symptoms,
> including pain, and the extent to which your symptoms can reasonably be
> accepted as consistent with the objective medical evidence and other
> evidence. By objective medical evidence, we mean medical signs and
> laboratory findings as defined in § 404.1528 (b) and (c). By other
> evidence, we mean the kinds of evidence described in §§ 404.1512(b)(2)
> through (8) and 404.1513(b)(1), (4), and (5), and (d). These include
> statements or reports from you, your treating or nontreating source, and
> others about your medical history, diagnosis, prescribed treatment, daily
> activities, efforts to work, and any other evidence showing how your
> impairment(s) and any related symptoms affect your ability to work. We
> will consider all of your statements about your symptoms, such as pain,
> and any description you, your treating source or nontreating source, or
> other persons may provide about how the symptoms affect your activities
> of daily living and your ability to work.
>
> ***
>
> In evaluating the intensity and persistence of your symptoms, including
> pain, we will consider all of the available evidence, including your medical
> history, the medical signs and laboratory findings and statements about

how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in

relevant part:

Factors relevant to your symptoms, such as pain, which we will consider include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

However, while an ALJ is required to consider these factors, he is not required to explicitly discuss each one. *See, Pellam v. Astrue*, 508 Fed.Appx. 87, 91, 2013 WL 309998 at *3 (2d Cir. Jan. 28, 2013) ("The ALJ did not apply an incorrect legal standard when judging the credibility of Pellam's testimony. Although the ALJ did not explicitly discuss all of the relevant factors, Pellam has failed to point to any authority requiring him to do so. In any event, the ALJ cited the applicable regulation, 20 C.F.R. § 404.1529, explicitly mentioned some of the regulatory factors (such as Pellam's limited use of pain medication), and stated that he considered all of the evidence required by §

404.1529."). If it appears that the ALJ considered the proper factors, her credibility determination will be upheld if it is supported by substantial evidence in the record. *Id*.

THE ALJ'S DECISION

On June 14, 2012, the ALJ issued the decision that is the subject of this action. (13-22). At the first step of the five-step sequential analysis described above, the ALJ found that Plaintiff had not engaged in substantial gainful employment since January 1, 2009. (15). At the second step of the analysis, the ALJ found that Plaintiff had the following severe impairments: "hand, foot, elbow, hip, neck, shoulder and bilateral knee pain, depression, and anxiety." (15). At step three of the five-step analysis, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (17).

Prior to reaching step four of the analysis, the ALJ determined that Plaintiff had the following RFC:

> [C]laimant has the residual functional capacity to perform sedentary work, as defined in 20 CFR 404.1567(a), except that she is restricted from walking on uneven surfaces and is limited to occasional reaching. The claimant is also limited to simple tasks and occasional interaction with coworkers and the general public.

(18).

At step four of the five-step analysis, the ALJ found that Plaintiff was unable to perform any of her past relevant work. (20). For example, the ALJ found that Plaintiff could not perform her past work at McDonald's, which was light exertional work that required her to stand for hours at a time. (67). However, at step five of the analysis, the ALJ found, based on testimony from a vocational expert, that with the RFC set forth

above, Plaintiff could still perform other jobs in the national economy. (21).  Specifically, the ALJ found that Plaintiff could perform two sedentary unskilled jobs: brake linings coater, DOT 574.685-010 and label pinker, DOT 585.685-062. (21).

DISCUSSION

As mentioned earlier, Plaintiff maintains that the Commissioner's ruling must be reversed for the following reasons: 1) the ALJ did not properly evaluate her credibility because he failed, in the first instance, to indicate whether she had a medically determinable impairment that could reasonably be expected to produce her alleged pain; 2) the ALJ did not properly evaluate her credibility because, in considering the factors under 20 CFR § 404.1529, he "misconstrued [her] testimony on a number of important issues," such as the frequency of her mental health therapy sessions and the extent of her activities of daily living (working, using the computer, talking on the telephone); and 3) the ALJ failed to give good reasons for giving only limited weight to the opinion of Plaintiff's treating rheumatologist, Arango.

<u>Whether the ALJ failed to determine whether Plaintiff has a medically determinable impairment that could reasonably be expected to produce her symptoms.</u>

On this point, Plaintiff relies largely on *Meadors v. Astrue*, 370 Fed.Appx. 179, 183 (2d Cir. 2010).  In *Meadors*, the Second Circuit held that an ALJ erred because, when he found that the claimant was not credible, he did not indicate whether he found that the medical evidence failed to show that she had a condition that could produce her pain, or whether he found that she had such a condition, but that she was exaggerating the extent of her symptoms.  Specifically, the Circuit Court stated:

22

Put another way, our Court is unable to discern whether the ALJ found that: (1) Appellant's contentions of pain are not reasonably consistent with those medical conditions from which she suffers; or (2) Appellant's contentions of pain are consistent with those medical conditions, but the intensity and persistence she identifies are unsubstantiated and her subjective allegations alone are not credible. "This is important because at the first step in the credibility analysis, [Appellant's] allegations need not be substantiated by medical evidence, but simply consistent with it. The entire purpose of [§ ] 404.1529 is to provide a means for claimants to offer proof that is not wholly demonstrable by medical evidence." *Hogan v. Astrue*, 491 F.Supp.2d 347, 353 (W.D.N.Y.2007) (emphasis in original; internal quotation marks and ellipses removed). "[O]nly allegations beyond what is substantiated by medical evidence are to be subjected to a credibility analysis." *Id*. (internal quotation marks removed).

*Meadors v. Astrue*, 370 Fed.Appx. at 184.

In the instant case, the ALJ set forth the correct standard for evaluating credibility, and indicated that he was applying it. (18).  Furthermore, the ALJ observed that he would only evaluate the credibility of Plaintiff's statements "whenever statements about the intensity persistence or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," which is just a restatement of the standard recited in *Meadors*.[5] (18).  Additionally, although the ALJ could have perhaps been more clear on this point, his decision indicates that the medical evidence was consistent with Plaintiff's complaints to an extent, but that she was exaggerating the disabling effect of her symptoms.  That is, the ALJ did not suggest that Plaintiff was not actually suffering from body pain and migraines, but he indicated that Plaintiff's subjective complaints exceeded the level of pain that was

---

[5] *See, Meadors*, 370 Fed.Appx. at 183 ("[T]o the extent that the claimant's pain contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry.").

23

consistent with the medical record:

> [T]he reports submitted by her treating sources fail to provide evidence of clinical or laboratory findings consistent with *the alleged severity* of the claimant's subjective complaints of pain and functional limitations.
>
> ***
>
> With regard to the claimant's alleged migraine headaches, *I do not credit her testimony that they occur three times a week and can last all day. This allegation* is not supported by any reports from the claimant's doctors.

(16-17) (emphasis added).  Moreover, after reviewing the evidence concerning

Plaintiff's activities of daily living, the ALJ stated:

> I find that the claimant's medically determinable impairments could not reasonably be expected to cause *all* of the alleged symptoms.  The claimant's statements concerning the *intensity, persistence and limiting effects* of these symptoms are not generally credible[.]

(19) (emphasis added).  Consequently, the Court does not believe that the ALJ

committed the error that required reversal in *Meadors*.

> <u>Whether the ALJ properly evaluated Plaintiff's credibility, under 20 CFR § 404.1529, or whether his credibility determination was based on a misstatement of her testimony.</u>

On this point, Plaintiff contends that the ALJ misunderstood or misstated her

testimony about such matters as the frequency of her mental health therapy sessions

and the extent of her activities of daily living, such as working, using the computer and

talking on the telephone.  At the outset, Plaintiff contends that the ALJ attempted to

"pigeonhole" her, or set a trap for her, by asking her how often she attended therapy,

and by then stating in his decision that "the record does not support the alleged

frequency of her attendance at therapy sessions." (19).  However, the Court does not

agree with Plaintiff that the ALJ was unfair to Plaintiff, or that he mis-characterized her testimony as to this issue.  As discussed above, Plaintiff clearly failed to follow up on therapy despite repeated urging from her primary care physician, and the reasons that she gave for her failure to do so are not compelling.  On the other hand, the record indicates that Plaintiff's alleged mental health issues have little effect on her everyday functioning.   Consequently, the ALJ did not err in considering those factors when assessing Plaintiff's credibility.

Plaintiff further contends that the ALJ "cherry picked" certain testimony of hers and improperly used it to discredit her.  For example, Plaintiff contends that the ALJ took her testimony, concerning her ability to work at McDonald's and perform household chores, out of context.  Of course, an ALJ "cannot simply selectively choose evidence in the record that supports his conclusions." *Meadors v. Astrue*, 370 Fed.Appx. at 185, 2010 WL 1048824 at *4, n.2  (citation omitted).  However, the Court does not agree that the ALJ did so.

As the ALJ pointed out, Plaintiff's testimony indicates that she is generally able to perform a wide variety of household chores, including driving family members to work and to appointments, and that she needs her daughters' assistance only for certain particularly difficult or repetitive tasks.   Similarly, it was not error for the ALJ to observe that, up until two weeks prior to the administrative hearing, Plaintiff was able to perform her work at McDonald's (20), which was classified as "light" work and which involved constant standing and repetitive use of the hands, or to find that such work, even on a part-time basis, suggests that Plaintiff's exertional abilities are beyond those which she

now claims.[6]

Plaintiff contends that the ALJ also erred by misstating her testimony concerning her ability to use a computer and talk on the telephone.  With regard to the computer, the ALJ stated, "She shops and goes on the computer.  She claimed that she only went on the computer twice a week, yet I note that she has a Facebook account." (20). Plaintiff maintains that "[i]t is unfathomable how the presence of a Facebook account provides evidence of computer use more than twice a week." Pl. Memo of Law [#12-1] at p. 26.

On this point, the Court notes, at the outset, that Plaintiff has made inconsistent statements about her computer usage.  At the hearing, Plaintiff initially indicated that she could "type" on the computer for "like half an hour maybe once, twice a month." (46).  Plaintiff indicated that the act of "typing" causes her hands to "cramp up" and "get stiff." (46).  Later during the hearing, Plaintiff indicated that she uses the computer "probably twice a week" to check her Facebook account, and that she spends fifteen or twenty minutes on the computer per session. (62-63).  Previously, in March 2011, Plaintiff told the Commissioner that using the computer was one of her hobbies, and when asked how often she pursued such hobby, she responded, "Most of the time." (175).  Similarly, in April 2011, Plaintiff appears to have indicated that she uses the computer for five to ten minutes each day. (192).  However, while Plaintiff has made such inconsistent statements, and while the ALJ could have relied on them to question Plaintiff's credibility, he did not do so expressly.  Instead, the ALJ implied that Plaintiff

---

[6] The ALJ also acknowledged that Plaintiff was no longer able to perform such "light" work on a full time basis, though he found that she could perform sedentary work.

probably uses her computer more than twice per month, since she has a Facebook account.

The Court agrees that having a Facebook account does not prove or disprove how often a person uses their computer.  Consequently, it was incorrect for the ALJ to rely upon such fact to reach any conclusion about Plaintiff's credibility.  On the other hand, the Court finds that such error was harmless, since the ALJ only mentioned it in passing, and since he gave several other reasons for questioning her credibility. *See, Buscemi v. Colvin*,  No. 13–CV–6088P, 2014 WL 4772567 at *17 (W.D.N.Y. Sep. 24, 2014) ("[T]he remaining evidence in the record identified by the ALJ was sufficient to support his adverse credibility determination. Accordingly, I conclude that the ALJ's misstatements of the record were harmless and that the credibility assessment is supported by substantial evidence.") (citations omitted).

With regard to Plaintiff's use of the telephone, the ALJ stated that "[t]he claimant also texts and talks to family members *for extended periods* on the telephone, showing good social interaction." (20) (emphasis added).  Plaintiff contends that such observation was erroneous, since "there is no testimony that Plaintiff carries on extended telephone conversations." Pl. Memo of Law [#12-1] at p. 27.  The Court agrees that the record mentions the frequency of Plaintiff's telephone calls to her relatives, but not the duration of the actual calls.  Consequently, the ALJ's reference to "extended periods" was unsubstantiated.  Nevertheless, as with the previous alleged error, the Court does not find that such error requires reversal. *See, Buscemi v. Colvin*, 2014 WL 4772567 at *17.  In that regard, the ALJ's point was that Plaintiff maintains

social interaction with her family on a regular basis, which is supported by substantial evidence,[7] not that she has the exertional ability to talk on the telephone for long periods of time.   If the ALJ had relied on such a mistaken observation as support to show, for example, that Plaintiff could sit for long periods of time, the Court might well take a different view.  However, as it is, the ALJ's improper speculation regarding the length of Plaintiff's telephone calls to her family members was harmless, since in the Court's view it is the fact of the regular calls, and not their duration, that supports the ALJ's observation regarding Plaintiff's social interaction.[8]

For the foregoing reasons, the points raised by Plaintiff concerning the ALJ's credibility determination do not require reversal.

Whether the ALJ the failed to give good reasons for giving only limited weight to the opinion of Arango, Plaintiff's treating rheumatologist

Plaintiff contends that the ALJ improperly failed to give Arango's opinion controlling weight, and that if he had done so, he would have found that she was disabled.  Specifically, Plaintiff states:

Dr. Ana Arango, Plaintiff's treating rheumatologist, provided an opinion statement in which she opined that Plaintiff would frequently experience pain severe enough to interfere with her attention and concentration (Tr. 900), that Plaintiff could only walk for five to ten minutes at a time, sit for twenty minutes and stand ten to fifteen minutes before having to change

---

[7]The record indicates that Plaintiff was in constant, daily contact with her immediate family, including her husband, two school-age sons, two adult daughters, and one grandchild, all of whom live with her in the same house, that she has at least monthly telephone conversations with her family members living outside of New York, and that she also has regular contact with her husband's family members.

[8]On this point, the Court notes that earlier in his decision, the ALJ expressed essentially the same point, without regard to the duration of the calls, by stating: "[S]he apparently interacts well with her family and the claimant indicated that she talks to family members on the telephone regularly." (17).

> positions, that she could only sit about four hours in a work day and stand
> about two hours in a work day, that she would require extra breaks, would
> need to be permitted to alternate sitting and standing at will, was limited in
> postural movements, limited in the use of the hands bilaterally, and would
> likely have good days and bad days, being absent about four times per
> month. (Tr. 900-903).  If this opinion was accorded controlling weight, the
> limitations described therein would likely have led to a finding of disability.

Pl. Memo of Law [#12-1] at pp. 27-28.  Plaintiff maintains that the ALJ failed to explain
how Arango's opinion was inconsistent with the record as a whole, and that if he
thought that Arango's opinion was baseless or speculative, he had an obligation to re-
contact her for clarification. Pl. Memo of Law [#12-1] at p. 29.  Plaintiff further contends
that the ALJ erroneously concluded that Plaintiff's condition was less severe than
Arango indicated, since Plaintiff was receiving only conservative treatment. *Id.*

The Court observes, at the outset, that the ALJ referred to the proper standards
for evaluating medical opinion evidence, and indicated that he was applying them. (18).
Additionally, the ALJ summarized the medical record, both with regard to Plaintiff's
treating physicians and the consulting physicians. (15-17).  Then, the ALJ stated:

> As for the opinion evidence, little weight is given to the opinion of Dr.
> Arango (Exhibit 25F), since it is not supported with relevant evidence.  Dr.
> Arango's opinion is not consistent with the record as a whole and there is
> no reason to find that the claimant can only work for 20 minutes and then
> need a 10 minute rest break.  Dr. Arango's assessment that the claimant
> would miss more than four days of work per month is purely speculative.
> The objective evidence, in terms of the claimant's mild treatment, would
> not support these extreme limitations.
>
> Great weight is afforded the consultative medicine examination of Dr.
> Boehlert (Exhibit 8F), since it is consistent with the record as a whole and
> is supported by relevant evidence.  Dr. Boehlert referred to the mild
> medications the claimant was taking and noted that the clinical

29

examination revealed equal 5/5 strength in her hands.  Great weight is also accorded is also accorded the consultative psychiatric evaluation report of Dr. Jean-Jacques (Exhibit 7F), as it is consistent with the record as a whole.

(20).

As mentioned above, the pertinent regulations require the Commissioner to give controlling weight to a treating physician's opinion only where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).  When the Commissioner does not give such controlling weight, she must still consider the pertinent factors to decide how much weight to give the treating doctor's opinion, and give reasons for her decision. *See, id.*  Here, the ALJ found that Arango's opinion was neither well-supported nor consistent with the other substantial evidence of the record, and he explained his reasons, though rather briefly.  Moreover, the reasons that he gave are supported by substantial evidence. *See, Rosier v. Colvin*, — Fed.Appx. — , 2014 WL 5032325 at *1 (2d Cir. Oct. 9, 2014) ("[T]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*.") (emphasis in original, citation omitted).

In that regard, Arango's examination notes, while indicating that Plaintiff in fact has some type of difficult-to-categorize problem with her joints or connective tissue, show only mild findings: a positive Phalen's test for Plaintiff's right hand on September 5, 2007 (875); tenderness in Plaintiff's hips upon rotation on October 4, 2007 (877); tenderness in Plaintiff's hands and feet on February 4, 2008 (881); a positive

30

Finkelstein test in Plaintiff's thumb on June 1, 2008 (883); decreased pulse in Plaintiff's feet on July 12, 2010(885); tenderness in Plaintiff's neck, shoulders and hands on June 2, 2011 (888); tenderness in Plaintiff's elbows, hips and back on February 29, 2012 and April 4, 2012 (889, 891); and tenderness in Plaintiff's elbows, hands, wrists, hips, knees, ankles and toes on May 3, 2013 (896).  Arango never reported having actually observed Plaintiff experiencing the type of severe pain that she claims to experience on a constant basis; instead, Arango repeatedly noted that Plaintiff appeared to be in no acute distress. (875, 877, 879, 881, 883, 885, 888, 889, 891, 896).

Consequently, it seems clear that when Arango completed her disability report purporting to detail Plaintiff's abilities and limitations, she was, for the most part, merely relating what  Plaintiff told her. *See, e.g.*, (895) ("All information was obtained from the chart or directly from the patient per her report."); *Id*. ("She finds it difficult to do normal activities due to her pain."); (900, 903) (Opinions regarding Plaintiff's ability to handle stress and the frequency with which she would miss work were "per pt. [patient's] report.").  This appears true particularly with regard to Plaintiff's ability to sit, stand, walk and attend work on a regular basis, since Arango's report specifically indicates that her statements on those points are based only on Plaintiff's own "estimates." (895-896).  At the same time, in at least one significant respect, *i.e.* with regard to Plaintiff's ability to stand, Arango went beyond even what Plaintiff stated, and indicated that Plaintiff could only stand for two hours. (Compare, 896 and 901; Plaintiff indicated that she could stand for four hours).

Of course, a treating source's opinion may take into account the claimants's own subjective complaints or report: "Medically acceptable clinical and laboratory diagnostic

31

techniques include consideration of a patient's report of complaints, or history, as an essential diagnostic tool." *Burgess v. Astrue*, 537 F.3d 117, 128  (2d Cir. 2008) (*quoting Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003), internal quotation marks omitted).  However, a treating source's opinion is not considered well-supported if it is based entirely on the claimants's own subjective reports. *See, Baladi v. Barnhart*, 33 Fed.Appx. 562, 564, 2002 WL 507139 at *2 (2d Cir. Apr. 4, 2002) (A medical opinion based on "plaintiff's subjective complaints of pain and unremarkable objective tests" is not considered to be well supported by medically acceptable clinical and laboratory diagnostic techniques); *see also, Polynice v. Colvin*, 576 Fed.Appx. 28, 31 (2d Cir. Aug. 20, 2014) ("Much of what Polynice labels 'medical opinion' was no more than a doctor's recording of Polynice's own reports of pain.").  In the instant case, the ALJ determined that Arango's opinion was, in large part, based solely on Plaintiff's subjective reports as opposed to any clinical findings, and that determination is supported by substantial evidence.

Similarly, the ALJ's determination, that Arango's opinion is not consistent with the record as a whole, is also supported by substantial evidence.  In that regard, the ALJ referenced the reports of Boehlert and Jean-Jacques, as well as Plaintiff's self-reported activities of daily living (17, 19-20), as being inconsistent with the severe limitations contained in Arango's report.  The ALJ's determination with respect to this issue is supported by substantial evidence, and consequently Plaintiff's argument on this point lacks merit.

CONCLUSION

Defendant's motion (Docket No. [#15]) for judgment on the pleadings is granted

and Plaintiff's motion [#12] for judgment on the pleadings is denied.  The Clerk of the

Court is directed to close this action.

So Ordered.

Dated: Rochester, New York
       January 12, 2015

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge